J-S25018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 334 WDA 2022 |

Appeal from the Order Entered March 1, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000132-2021

BEFORE:  BENDER, P.J.E., DUBOW, J., and KING, J.

MEMORANDUM BY DUBOW, J.:                **FILED: OCTOBER 3, 2022**

A.D. ("Mother") appeals from the March 1, 2022 Order that involuntarily terminated her parental rights to J.C. ("Child"), who was born in November 2019.  Upon careful review, we affirm.[1]

Mother and Child became known to the Allegheny County Office of Children, Youth, and Families ("the Agency") for safety concerns regarding domestic violence and substance abuse in the home.  On February 18, 2020, the Agency received a report that Mother, Child's biological father ("Father"), and Child's maternal grandmother ("Maternal Grandmother") were involved in a physical altercation.  Mother reported that Father struck her several times while she was holding then-3-month-old Child and when Maternal Grandmother attempted to intervene, Father began to strike Maternal

_____

[1] The trial court also involuntarily terminated the parental rights of Child's biological father, who is not a party to this appeal.

Grandmother prompting Mother to stab Father in the back with a knife. Police arrested both parents and the Agency obtained emergency custody of Child and placed him in kinship care with his maternal great-grandparents.[2] Upon subsequent Agency investigation, then-18-year-old Mother admitted that she was drinking alcohol on the night of the incident and acknowledged her ongoing use of alcohol and marijuana.

On May 6, 2020, the trial court adjudicated Child dependent and ordered Mother to participate in domestic violence counseling, enroll and participate in intensive outpatient mental health treatment, comply with random drug and alcohol screens, and address her criminal charges. Additionally, the court permitted weekly supervised visitation between Mother and Child.[3]

During the summer of 2020, Child was placed in the pre-adoptive foster home of A.B. ("Foster Mother") and D.B. ("Foster Father") (collectively, "Foster Parents"), where Child remains.[4]

The trial court held permanency review hearings on September 3, 2020, November 12, 2020, February 18, 2021, and May 13, 2021. At each review hearing, the trial court found that Mother was minimally compliant with services and made minimal progress. The court continued to order Mother to

---

[2] Mother's criminal charges were eventually dropped.

[3] Visits were initially conducted virtually due to the COVID-19 pandemic, but eventually returned to in-person.

[4] This occurred after Child's maternal great-grandparents expressed to the Agency that they were no longer able to care for Child and subsequently moved to Florida.

comply with the above court-ordered services. Additionally, the court ordered Mother to attend dual diagnosis treatment and participate in a coached parenting visitation program.

**A.**

On July 21, 2021, the Agency filed a petition to involuntarily terminate Mother's parental rights to Child. The trial court appointed counsel to represent Child in the proceeding and held a hearing on the petition on February 11, 2022. During the hearing, the trial court heard testimony from Jason Lucarelli, Agency caseworker; Tarraca Jackson, Allegheny County Health Department supervisor; Ethan Tuxill, therapist; Eric Bernstein, Ph.D., licensed psychologist; Ciera James, Agency caseworker; Kirk Thoma, parenting coach; and Mother.

Mr. Lucarelli informed the court that he was the Agency caseworker assigned to Mother and Child from February of 2020 until August of 2021 and, in sum, testified to the above events.

Additionally, Mr. Lucarelli updated the court regarding Mother's progress with her court-ordered goals. Mr. Lucarelli testified that Mother was referred for coached parenting twice and never successfully completed the program while he was the caseworker.

Mr. Lucarelli also testified that Mother was inconsistent with visitation despite the Agency assisting her with transportation. He explained that visits were initially occurring in Foster Parents' home, which was not accessible via public transportation, so he offered to transport Mother to the visits. Mr.

Lucarelli testified that he transported Mother to visits at the Foster Parents' home twice, and Mother cancelled three times. Mr. Lucarelli explained that the in-home visits were not going well, so they were moved to the Baer Foundation in October 2020, which was accessible via public transportation, and Mother continued to visit inconsistently.

Mr. Lucarelli testified that Mother had not successfully completed domestic violence counseling at the time the termination petition was filed. Mr. Lucarelli explained that Mother had attended some sessions, but the Agency continued to have concerns because Mother "continuously found herself in the cycle of domestic violence" as evidenced by her ongoing relationship with Father and her brief romantic relationship with another man where she reported domestic violence incidents to the Agency. N.T. Hearing, 2/11/22, at 76.[5]

Mr. Lucarelli also explained that Mother completed a POWER evaluation, which recommended that Mother engage in intensive outpatient dual diagnosis

_____

[5] Specifically, Mr. Lucarelli testified that Mother reported multiple concerning incidents to the Agency, including: (1) in August 2020 Mother invited Father to her home but had to call the police because he was intoxicated, belligerent, had brass knuckles, and refused to leave; (2) Mother cancelled a visit with Child after someone "affiliated with" Mother's new paramour came to her home which resulted in a fistfight where Mother sustained injuries; (3) the night before Mother's evaluation with Dr. Bernstein, Mother's new paramour broke into Maternal Grandmother's home, choked Mother, stole Mother's phone, and Mother continued to interact with the paramour, including bringing him to the evaluation and visitation with Child; and (4) in July 2020, Mother's paramour "showed up to her visit at the Baer Foundation, prompting [Mother] to sequester herself in the bathroom" refusing to call the police as recommended until two weeks later. N.T. Hearing, 2/11/22, at 76-77.

treatment; Mother was referred for treatment and was discharged in April of 2020 for noncompliance. Mr. Lucarelli stated that Mother never provided the Agency documentation that she successfully completed drug and alcohol or mental health treatment. Mr. Lucarelli confirmed that Mother was inconsistent in attending her random drug screens while he was the caseworker.

Mr. Lucarelli explained that the Agency referred Mother for a single-mother housing program and assigned service coordinator, and Mother was discharged for not following through. Mr. Lucarelli further testified that Mother was invited to attend parent-child interactive therapy that was recommended by Child's primary care physician and Mother failed to attend.

Finally, Mr. Lucarelli testified that Child is extremely attached to Foster Parents who provide Child with safety, stability, and love. He concluded that termination of Mother's parental rights would be in Child's best interest.

Ms. Jackson explained that she was a supervisor for the Allegheny Health Department drug and alcohol screening lab. Ms. Jackson testified that Mother was called in for 42 random drug screens but only completed 9 screens, which were all negative for alcohol or illegal drugs.

Mr. Tuxill testified that Mother was a patient of his when he was employed as a licensed therapist at Pittsburgh Mercy Behavioral Health. Mr. Tuxill testified that the Agency referred Mother for dual diagnosis treatment, but Mother reported that she did not have any issues with substance abuse. Mr. Tuxill testified that, from his initial assessment, it did not appear that Mother was using illegal substances on a frequent basis, so he focused his

individual therapy sessions on emotion regulation skills and working on healthy relationship patterns and referred Mother to dual diagnosis group sessions. Mr. Tuxill testified that Mother attended three or four weekly sessions, but then missed three sessions for non-emergency reasons, which resulted in Mother being discharged for non-compliance.

Dr. Bernstein testified as an expert in psychology and child psychology. Dr. Bernstein informed the court that in February 2021, he performed an individual mental health evaluation of Mother as well as a bonding evaluation between Mother and Child, and in December 2021, he performed an interactional evaluation between Mother and Child. Dr. Bernstein testified that he diagnosed Mother with an adjustment disorder with mixed anxiety and depressed mood. Dr. Bernstein stated that during the February evaluation he observed Mother respond to Child's needs, support Child's playfulness, redirect Child, and show Child affection by kissing him. However, Dr. Bernstein also observed that Mother struggled with setting appropriate boundaries for Child and was unable to get Child to comply with requests to clean up toys. Dr. Bernstein testified that, based on his initial evaluation, he recommended that Mother continue supervised visitation and participate in coached parenting.

Dr. Bernstein further testified that Foster Parents serve as Child's "psychological parents." *Id.* at 26, 28. Dr. Bernstein explained that Child relies on Foster Parents for his everyday needs, emotional support and care, and to provide a safe and loving environment. Dr. Bernstein confirmed that

Mother has a bond with Child, but that bond is compromised by Mother's limited attendance at visits and limited "fulfilled responsibilities of caretaking[,]" which Dr. Bernstein explained entailed "the day-to-day in-and-out duties of enforcing and providing a structure, routine, changing diapers, supporting [C]hild's learning, offering [Child] affection, appropriate correction, stimulation, as well as taking [C]hild to necessary appointments." *Id.* at 29. Dr. Bernstein testified that Child does not have a "healthy and secure bond" with Mother. *Id.* at 30. Dr. Bernstein opined that Child would not be "deleteriously" impacted if Mother's parental rights were terminated and that termination of Mother's parental rights was in Child's best interest. *Id.* at 29. Dr. Bernstein further opined that to remove Child from Foster Parents at this time "could have long term effects." *Id.* at 31.

Ms. James informed the court that she was Mother and Child's current Agency caseworker. She testified that Mother recently resumed mental health treatment in December of 2021, failed to ever engage in drug and alcohol treatment, was currently attending coached parenting but was at risk of discharge, and completed her domestic violence counseling sessions. Ms. James explained that Child is well bonded with Foster Parents, that Child seeks affection and comfort from them, and that Foster Parents are able to redirect and comfort Child during any "emotional or behavioral dysregulation" and "bring him back to a baseline[.]" *Id.* at 114-15.

Mr. Thoma testified that he provides coached visitation sessions to Mother once a week. Mr. Thoma explained that Mother is often late or cancels

sessions but has not been discharged yet because "[s]he gets to about two missed visits" within 30 days and there is a policy to discharge the client if they miss three visits within 30 days. *Id.* at 124. Mr. Thoma testified that Mother's goals included to discipline Child when Child acts out, to attend visits on time, and to understand Child's developmental age.

Mr. Thoma explained that Mother can be difficult but her attitude and understanding about the importance of coached visitation has improved. However, Mr. Thoma stated that he has not seen improvement in attending visits on time or consistently, and informed the court that Mother was late for approximately half of the visits. Mr. Thoma testified that Mother was good at making sure Child's physical needs were met, including snacks, drinks, and diaper changes, but was inconsistent with providing redirection for unwanted behaviors and that Mother has plateaued in her progress. Mr. Thoma further testified that Mother and Child have a strong bond, one of the stronger bonds that he has observed, but that it is not necessarily a healthy bond.

Mother admitted that she was drinking alcohol on the night that Child was removed from her care but testified that she has not consumed an alcoholic beverage for over a year. Mother stated that she recently re-engaged in mental health therapy at Chartiers in December 2021, and that the therapy is helping her to manage her anxiety and depression. Mother explained that she missed a lot of her drug screens and visitation because she was working, the buses were inconsistent, and it was hard to go when she

was nine months pregnant.[6]   Mother further testified that she completed domestic violence counseling, has a job at a store in the mall, is planning to move into a three-bedroom apartment on March 1, 2022, and is no longer in a romantic relationship with Father.  Mother explained that in her domestic violence counseling, she learned how to recognize healthy versus unhealthy relationships and set boundaries for respect.  Mother testified that both the domestic violence counseling and coached parenting were very helpful.

Mother explained that she thought the supervised visits were going well. Mother confirmed that she attended Child's three-year-old well check-up and was with Child when he had surgery to remove his tonsils.

Finally, Mother testified that she has an "unbreakable" bond with Child. *Id.* at 136.  Mother testified, "he really enjoys being with me, and I do believe we have a very positive bond, and I really don't think if he were to get taken and rights go away, that that would benefit him at all." *Id.* at 146.  Mother testified that if Child were returned to her care, "that would be amazing.  I would spend so much time with him and make up all the time we have lost together." *Id.*  Mother admitted that she "went down the wrong path" in the past, but testified, "I'm working on myself right now trying to get everything together.  It's going really, really well.  I'm really proud of myself" and explained that she was in a much better place now. *Id.* at 145-47.

The trial court granted the termination petition on March 1, 2022.

---

[6] Mother was pregnant with a second child.

Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Br. at 6.

## B.

When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe

- 10 -

all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(2).

## C.

In her first issue, Mother avers, *inter alia*, that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(a)(2). Mother argues that she remedied the issues which brought Child into placement, *i.e.*, substance abuse and domestic violence issues, and that

the Agency failed to provide clear and convincing evidence that she was unable to provide essential care to Child. Mother's Br. at 28. We disagree.

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010).

Finally, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *Id.* at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being,"

especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

Applying these principles, the trial court concluded that Mother's refusal to consistently participate in services and failure to make progress towards the completion of her court-ordered goals has prevented Mother from providing essential parental care to Child. The trial court emphasized that Mother did not successfully complete or meaningfully engage in mental health treatment. Trial Ct. Op., dated 4/22/22, at 11. While Mother initially underwent a mental health evaluation at the beginning of the case, she only attended three therapy sessions and was ultimately discharged for noncompliance. The trial court opined that mental health therapy "could have contributed to greater success in reunification. However, Mother did not make mental health a priority and did not re-engage in mental health treatment until December of 2021." *Id.* at 11-12.

Likewise, the trial court found that Mother failed to engage in drug and alcohol treatment, failed to consistently attend court ordered drug screens, and discredited Mother's testimony that she was living an alcohol-free lifestyle. The trial court opined, "Mother only attended nine out of forty-two drug screens. She has never given a reasonable explanation as to why she did not participate in drug and alcohol treatment or screens. Based upon this evidence and Father's drug use in the home, the [c]ourt does not believe that Mother has been maintaining a sober lifestyle." *Id.* at 13-14.

The trial court acknowledged that Mother completed domestic violence counseling but found that Mother did not "successfully complete the goal of addressing domestic violence issues" as evidenced by her ongoing relationship with Father and her brief romantic relationship with another man where she reported domestic violence incidents to the Agency. The trial court opined: "Despite completing treatment, Mother was unable to recognize dangerous situations and continued to engage in high-risk relationships with volatile partners." *Id.* at 12.

Finally, and perhaps most importantly, the trial court emphasized that Mother failed to progress to unsupervised visitation with Child during the two years that he was in care. The trial court found, "Mother has never been able to have unsupervised visitation with [C]hild based upon her poor attendance at visitation and her lack of progress with respect to parenting." *Id.* at 12. The trial court credited Mr. Lucarelli's testimony that he attempted to remove transportation barriers by personally offering Mother rides to visitation and ultimately changing the visitation to a location accessible by public transportation. Despite these accommodations, Mother's visits remained inconsistent. Moreover, the trial court emphasized that "Mother was referred to two coached parenting programs[;] she was discharged from the first and has "stalled" progress at the second due to attendance issues. *Id.* at 13.

The trial court found: "Mother's lack of compliance with her goals has dramatically affected her ability to provide a safe and stable environment for [C]hild" and concluded that the Agency presented clear and convincing

evidence to terminate Mother's parental rights pursuant to Section 2511(a)(2). Trial Ct. Op. at 14.

Our review of the record supports the trial court's findings, and we decline to reweigh the evidence or usurp the trial court's credibility determinations. Mother's refusal to consistently engage in services or participate in visitation has rendered her incapable of providing essential parental care to Child. Accordingly, we find no abuse of discretion.

**D.**

In her second issue, Mother avers that that the trial court abused its discretion when it concluded that terminating Mother's parental rights was in Child's best interest pursuant to Section 2511(b). Mother argues that the trial court should have considered Mr. Thoma's testimony that Mother and Child have a strong child-parent bond and that he has observed love and affection between them during coached visits. Mother's Br. at 30.

The trial court credited both Dr. Bernstein's testimony and evaluations and Ms. James' testimony when examining the bond between Mother and Child. The trial court opined:

> Dr. Bernstein opined that while a bond existed it was compromised due to Mother's limited attendance at visitation and unfulfilled responsibilities of caretaking. Dr. Bernstein further reported that [C]hild has developed a strong and healthy relationship with his foster parents and views them as his psychological parents. It was his belief that the foster parents could adequately address any negative impacts resulting from the termination of Mother's parental rights. The current [Agency] caseworker, Sierra James, has also observed a strong bond between [C]hild and his foster

parents. She reported that he seeks comfort and affection from them.

Trial Ct. Op. at 14-15. The trial court concluded that termination of Mother's parental rights would be in Child's best interest.

Mother asks us to reweigh the evidence and credit Mr. Thoma's testimony over Dr. Bernstein and Ms. James' testimony. We decline to do so. As the record supports the trial court's findings, we discern no abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  10/3/2022